UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DOUGLAS GROUP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:15 CV 1367 RWS |
| | ) |
| TF PUBLISHING, INC. and | ) |
| JIM PURCELL, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

Defendants TF Publishing, Inc. (TFI) and Jim Purcell move for summary judgment on all claims brought against them by Plaintiff Douglas Group. Because there are genuine issues of material fact in dispute, I will deny the motion.

## BACKGROUND

Plaintiff Douglas Group is an investment banking firm that represents business owners in buying and selling companies. Defendant TFI sells paper calendars and related products. Defendant Purcell is TFI's president and owner.[1] The parties entered into a letter agreement (the Agreement), effective June 1, 2014, in which Douglas Group agreed to represent TFI in procuring a buyer for TFI's

---

[1] Douglas Group filed this case in Missouri state court and Defendants removed it to this Court. Defendants allege diversity jurisdiction, as Douglas Group is a citizen of Missouri seeking over $75,000 and TFI and Purcell are both citizens of Indiana. See Notice of Removal and Amended Doc., ECF Nos. 1–1, 6.

assets. The Agreement provided that Douglas Group would perform its services on a contingent fee basis. [2] See Agreement ¶ III.A.1, ECF No. 48–1, Ex. A. The Agreement contained a number of provisions regarding the contingent fee, including that Purcell "is willing to sell to any capable buyer who tenders a bona fide offer at or greater than the 'minimum acceptable sales price'" [$7 million] and that he "agrees that in the event that bona fide offers are tendered in the amount of the 'minimum acceptable sales price' or more, the contingent fee will be due in full as calculated on such offered amounts, even if he should decide to reject all such offers." Id. ¶ III.B.1, F. The Agreement defines an offer as "any expression of definitive intent, with the purchase price specified, even though such offer may still be subject to normal pre-closing contingencies, such as requirements for buyer due diligence to verify data represented." See id. § III.F.

Deborah Douglas signed the Agreement as President of Douglas Group. The Agreement contained two signature blocks for acceptance, with one reading "TF Publishing, Inc." at the top and "Jim Purcell, President" at the bottom and the other below it reading "Jim Purcell, as an Individual." Purcell's signature appears only once, above the line reading "President." See id. at 8. Section III.I of the

---

[2] The Agreement also contained a provision regarding an engagement initiation fee and subsequent retainer fees. TFI filed a counterclaim for breach of contract and unjust enrichment, seeking return of the $80,000 it paid Douglas Group per this provision. The parties have not moved for summary judgment on TFI's counterclaim.

Agreement reads, "[t]he undersigned owner of the Company specifically agrees that he personally guarantees payment of fees due as outlined herein."

On June 5, 2015, Crofton Capital, a private equity firm, submitted a Letter of Intent regarding the proposed acquisition of TFI's assets (the Crofton Letter). See Crofton Letter, ECF No. 48–1, Ex. B. The Crofton Letter detailed "the major terms and conditions upon which [Crofton Capital] would pursue the Acquisition," including a description of the cash and non-cash assets it contemplated would be paid as consideration and a provision stating that beyond the confidentiality and exclusivity provision in the Letter, "this letter is non-binding, and neither Crofton Capital nor the Seller will be legally bound unless and until definitive agreements relating to the proposed transaction are executed by the parties." Id. at 1, 4. Defendants did not complete that deal, and they state they did not sign the Crofton Letter "due to its unacceptable contingencies and requirements, and its lack of sufficient detail." Defs.' Statement of Facts ¶ 48, ECF No. 48. Defendants assert they terminated their Agreement with Douglas Group on July 6, 2015.

Douglas Group filed suit against TFI and Purcell for breach of contract, alleging that though its efforts led to a bona fide offer from Crofton Capital that exceeded the minimum acceptable sales price, Defendants have refused to pay Douglas Group the $888,200 contingency fee it earned. Douglas Group alleges Purcell personally guaranteed payment of fees due under the Agreement.

Defendants now move for summary judgment, arguing judgment should be entered in their favor because the undisputed facts show Crofton Capital did not submit a bona fide offer and Purcell did not agree to personally guarantee any payment. Douglas Group opposes Defendants' motion, arguing the facts show they are entitled to a contingency fee or, at minimum, summary judgment is inappropriate because the Agreement is ambiguous and there are material facts in dispute.

## LEGAL STANDARD

In ruling on a motion for summary judgment, I must view the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party must establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1), (e). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

## ANALYSIS

The Agreement provides that Missouri law governs its interpretation. See Agreement ¶ VIII. "In Missouri, a party seeking to establish a breach of contract claim must prove: '(1) the existence of a valid contract; (2) the rights and obligations of each party; (3) breach; and (4) damages.'" Lafarge N. Am., Inc. v. Discovery Gp. L.L.C., 574 F.3d 973, 979 (8th Cir. 2009) (quoting Evans v. Werle, 31 S.W.3d 489, 493 (Mo. Ct. App. 2000)). The parties do not dispute that the Agreement is a valid contract, but they disagree about their rights and obligations under the contract and whether those rights and obligations were satisfied. Specifically, the parties disagree about (1) whether the Crofton Letter constituted a "bona fide offer;" (2) whether the combination of cash and non-cash assets offered met the minimum acceptable sales price; and (3) whether Purcell agreed to be individually liable for any fees owed under the Agreement.

"'The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and give effect to that intention.'" Id. (quoting J.E. Hathman v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973)). In interpreting a contract, "[w]e first examine the plain language of the agreement to determine whether it clearly addresses the issue at hand." Brittany Sobery Family Ltd. P'ship v. Coinmach Corp., 392 S.W.3d 46, 50 (Mo. Ct. App. 2013). "If the contract is unambiguous, then the intent of the parties is to be gathered from the

contract alone, and 'any extrinsic or parole evidence as to the intent and meaning of the contract must be excluded from the court's review.'" Lafarge, 574 F.3d at 979 (quoting Vidacak v. Okla. Farmers Union Mut. Ins. Co., 274 S.W.3d 487, 490 (Mo. Ct. App. 2008)). "Language is considered unclear, or ambiguous, if it is reasonably susceptible to more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." Brittany, 392 S.W.3d at 50. "Whether a contract is ambiguous is a question of law." Lafarge, 574 F.3d at 979. "If a contract is ambiguous, 'then a question of fact arises as to the intent of the parties, and thus it is error to grant summary judgment.'" Id. (quoting Essex Dev., Inc. v. Cotton Custom Homes, L.L.C., 195 S.W.3d 532, 535 (Mo. Ct. App. 2006)).

Defendants argue the Crofton Letter was not a bona fide offer. They argue the Crofton Letter was not an "expression of definitive intent," as the Agreement defines an offer, because it expressly stated it was non-binding, did not legally bind either side, and was full of contingencies and not so "definite in its terms that the promises and performances required by each party are reasonably certain." See Tinucci v. R.V. Evans Co., 989 S.W.2d 181, 184 (Mo. Ct. App. 1998) (explaining the elements of offer and acceptance required to form a contract). Defendants argue the parties did not intend to make Defendants liable for a contingent fee without giving them a chance to review definite terms of the deal or actually

6

complete the transaction, as could happen if an entity submitted a non-binding proposal and then decided unilaterally not to proceed.

Douglas Group argues the Crofton Letter was an "expression of definitive intent" that followed extensive negotiations and detailed definite terms for a deal, had Purcell not rejected it. They point out the absence of any language in the Agreement requiring the offer to be legally binding and argue that if the parties had intended to require that an offer be binding to trigger the contingent fee, they would have said so. They also argue the Agreement contemplates that multiple bona fide offers may be made and rejected, and as such, its plain language makes clear the parties did not intend to agree that an offer sufficient to trigger the contingent fee had to be legally binding on the parties, as Purcell would not then be free to reject some offers. See Agreement ¶ III.F ("in the event that bona fide *offers* are tendered," the contingent fee will be due in full, "even if he [Purcell] should decide to reject *all such offers*" (emphasis added)).

Reviewing the Agreement as a whole, I conclude the meaning of "bona fide offer" in the contract is ambiguous. The phrase "any expression of definitive intent" is not so clear as to make it readily apparent what would trigger the contingent fee or whether the Crofton Letter satisfied what the parties contracted for. Cf. Baum v. Helget Gas Prods., Inc., 440 F.3d 1019, 1022 (8th Cir. 2006) ("Under Missouri law, summary judgment in a contract case is appropriate only

7

where the contract language is so clear and unambiguous that the contract's meaning is readily apparent from the face of the document itself."). The Agreement specifies that an "offer" could still be subject to "normal pre-closing contingencies, such as requirements for buyer due diligence to verify data represented." See Agreement ¶ III.F. Neither party has shown the phrase "normal pre-closing contingencies" has a clear and accepted meaning by which I could determine whether the contingencies in the Crofton Letter met that standard without further evidence of the parties' intent. As a result of these ambiguities, an issue of fact precludes summary judgment on the question of whether the Crofton Letter was a bona fide offer that entitled Douglas Group to a contingent fee. See Baum, 440 F.3d at 1022; Lafarge, 574 F.3d at 979.[3]

Defendants argue that even if the Crofton Letter was an expression of definitive intent, I should grant summary judgment in their favor because the consideration offered in the Crofton Letter did not meet or exceed the minimum acceptable sales price of $7 million, as required to trigger the contingent fee. Defendants rely on testimony from Philip Ivey, the principal of Crofton Capital, to

---

[3] Defendants also argue that an offeror must have the ability to pay in cash in order to make a bona fide offer under Missouri law, which the Crofton Letter failed to satisfy by offering cash and non-cash assets. I doubt the relevance of the case they rely on, Schroeder v. Duenke, 265 S.W.3d 843 (Mo. Ct. App. 2008), both because it addressed a bona fide offer in an entirely different context—a claim against a purchaser of real property for specific performance of the right of first refusal—and because the parties here defined "bona fide offer" in their Agreement. Even if Schroeder is relevant, the court there found it inappropriate to decide this issue on summary judgment. See id. at 848 ("The bona fide character of the offer is a preliminary question which must be decided by the finder of fact.")

8

argue the only sum certain Defendants were sure to receive from this deal was $4.5 million in cash at closing. They also offer an expert report that evaluates the consideration offered and the contingencies in that offer and values the consideration at no more than $5.5 million. Douglas Group disputes Defendants' interpretation of what could be included in the sales price and both valuations of the offer, arguing the Agreement clearly contemplated that the price could be met through a combination of cash and non-cash assets and that Defendants' expert analysis is flawed because, among other issues, it fails to include assumption of TFI's debt in its calculation, which Douglas Group asserts could be valued at around $2.65 million. They argue that the addition of just three of the items Crofton offered—$4.5 million in cash at closing, a $1.5 million seller note, and the assumption of $2.65 million in debt—exceeds the minimum acceptable sales price, even without the other consideration offered.

Defendants ask me to disregard Douglas Group's calculation of TFI's debt, included in Deborah Douglas's affidavit, because they say Ms. Douglas lacks personal knowledge of TFI's debt. <u>See</u> Defs.' Motion to Disregard, ECF No. 52. Even if I were to disregard this calculation, Defendants neither provide a value themselves, even though the consideration in the Crofton Letter included "the assumption or payoff of the Company's working capital line of credit net of available cash," nor explain why their expert appears to have excluded it from his

valuation, which Douglas Group challenges. See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . (B) showing that the materials cited do not establish the . . . presence of a genuine dispute . . . .").

I conclude Defendants have not shown they are entitled to summary judgment on the grounds that the consideration offered in the Crofton Letter did not meet the minimum acceptable sales price. While the Agreement specifies that the "minimum acceptable sales price" is $7 million, it also includes provisions detailing how the proceeds would be calculated—including transfer of liabilities and buyer acceptance of interest-bearing debt—and what the sales price would encompass, including the present value of "non-compete agreements, consulting agreements, rents, royalties, or other consideration to be paid by the buyer to the shareholders, officers, or employees of the Company." Agreement ¶¶ III.B.2, C.2. The parties offer different interpretations of what consideration should be counted toward the price and how that consideration should be valued, which are issues that cannot be resolved just by reading the plain language of the contract. As a result, I conclude the parties' dispute over the value of the consideration offered in the Crofton Letter and whether it met the minimum acceptable sales price presents a material factual dispute that precludes summary judgment.

Finally, Defendants argue Purcell is not personally liable for any fees owed. Defendants point out that Purcell's signature only appears above the line reading "Jim Purcell, President" and not above the line reading "Jim Purcell, as an Individual." They argue Purcell signed only on behalf of TFI because he did not intend to personally guarantee any fees owed. See Wired Music, Inc. of the Great Midwest v. Great River Steamboat Co., 554 S.W.2d 466, 470–71 (Mo. Ct. App. 1977) ("[I]n order to hold a corporate officer individually liable in signing a contract of guaranty . . . the officer should sign the contract twice [,] once in his corporate capacity and once in his individual capacity."). Douglas Group argues the Agreement is ambiguous on this point for at least two reasons: (1) ¶ III.I states that "[t]he undersigned owner of the Company specifically agrees that he personally guarantees payment of fees due as outlined herein," and (2) Section X, regarding acceptance of the agreement, only instructed Purcell to sign in one place.

The inconsistency between the guaranty clause in the Agreement and the way Purcell executed the Agreement creates an ambiguity as to whether Purcell agreed to be individually liable for TFI's obligations under the Agreement. See Wired Music, 554 S.W.2d at 470 (refusing to hold as a matter of law that an officer executing a contract only in his official capacity cannot be held personally liable and holding "that where the form of an agent's signature is inconsistent with the assumption of personal liability under the terms of the contract . . . an ambiguity is

11

created allowing parol evidence to explain the true intent of the parties"); see also Lafarge N. Am., Inc. v. Miller, 375 S.W.3d 852, 854–55 (Mo. Ct. App. 2012) (explaining that while Missouri courts have adopted the policy that corporate officers should sign twice if they are to be held individually liable, Missouri "caselaw does not hold that the only way an agent can be liable under a guaranty of this nature is by signing twice" but rather that "this is the preferred method because it clearly manifests his intent to assume personal liability" (quotation marks omitted)). As a result, I cannot resolve that question on summary judgment.

Defendants filed a motion under Federal Rule of Civil Procedure 56(e) asking I disregard certain portions of an affidavit from Deborah Douglas relevant to the parties' intent and the value of Crofton's offer because her statements are not based on personal knowledge, purport to state legal conclusions as fact, or are otherwise inadmissible. See Defs.' Motion to Disregard, ECF No. 52. Even without relying on Douglas's affidavit, I conclude Defendants have not shown they are entitled to summary judgment. As a result, I will deny Defendants' motion to disregard certain portions of Douglas's affidavit without prejudice as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment #[46] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Disregard Certain Portions of the Affidavit of Deborah Douglas #[52] is **DENIED** without prejudice as moot.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 4th day of January, 2017.